UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

| | |
|---|---|
| LAMEKA GARY, on behalf of the Estate of Norman Gary, deceased, | )<br>)<br>) |
| Plaintiff, | )<br>) |
| v. | ) Cause No. 3:18-CV-957-PPS<br>) |
| CITY OF ELKHART, *et al*, | )<br>) |
| Defendants. | ) |

## OPINION AND ORDER

This case concerns a violent encounter involving officers of the Elkhart Police Department when they responded to an early morning burglary call. When they arrived at the scene, they heard shots being fired in the area. The officers immediately went to investigate and saw a man lying on the ground, bleeding from gunshot wounds, outside of a home where a large party was being held. One officer entered the alley adjacent to the house, followed shortly by another officer. A few seconds later, a vehicle spewing gravel came from around the back of the house and into the adjacent alley, then headed straight towards the officers, who, fearing for their safety and the safety of others, fired into the vehicle killing the driver. The vehicle drove across the street, hit another car, and stopped after hitting a tree. The driver was Norman Gary. Plaintiff Lameka Gary, on behalf of Gary's estate, filed this federal lawsuit, alleging that the Elkhart police officers used excessive force in violation of Gary's rights under the Fourth Amendment. [DE 1.] Plaintiff also asserts claims against the City of Elkhart for

failure to properly train its officers and failure to enforce its body camera policy. Finally, there is a state law claim for wrongful death.

Before me is Defendants' Motion for Summary Judgment and the Plaintiff's confusing response. [DE 51, 57, 58, and 60.][1] After reviewing the briefing by the parties and the extensive factual record, I find that 1) there was no Fourth Amendment violation, and that qualified immunity applies in any event; 2) any claim for municipal liability under *Monell* is unsupported; and 3) the supplemental state law claim for wrongful death will be dismissed without prejudice. Therefore, Defendants' Motion for Summary Judgment will be GRANTED.

## Background

Before diving into the merits of the case, I would be remiss if I did not comment on the briefing supplied by the Plaintiff in this case. The case is obviously a very serious one. A man has been shot and killed by the police and important legal issues are presented. Yet the Plaintiff's 95-page response brief looks nothing like a response to summary judgment, at least none that I've ever seen. The factual recitation is a meandering collection of snippets from various reports with indecipherable citations. Worse still, there is not a single citation to any caselaw discussing the serious issues raised by the Defendants. As we'll see in a moment, that decision can be especially fatal when the defense of qualified immunity is raised.

---

[1] I say "confusing" because Plaintiff initially filed two Responses [DE 57, 58]. Then, a couple days later, she filed a third Response but mislabeled it as a "Reply" on the docket at DE 60. All three filings include an identical 95-page brief. Her Response at DE 57 contains no attachments, the one at DE 58 contains 16 attachments, and finally the one at DE 60 contains 10 additional attachments. To say the least, Plaintiff's triplicate filing is confusing. But I will consider the 95-page Response and all 26 attachments in the combined filings, and, for simplicity's sake, her brief will be referred to in this opinion as DE 58.

What's more, under the Local Rules for the Northern District of Indiana, the party responding to a motion for summary judgment "*must* include a section labeled 'Statement of Genuine Disputes' that identifies the material facts that the party contends are genuinely disputed so to make a trial necessary." N.D. Ind. L.R. 56-1(b)(2) (emphasis added). That was not done here by the Plaintiff making my work much more difficult. When the Seventh Circuit said long ago that "[j]udges are not like pigs, hunting for truffles buried in briefs," they must've had cases like this one in mind. *United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991). This comment notwithstanding, I have done my best to scour the record searching for *material* disputes of fact. Here are the undisputed facts, unless noted otherwise.

At 3:43 am on December 4, 2016, Elkhart police officers—Sergeant Nathan Lanzen, Corporal Leonard Dolshenko, and Corporal Brandan Roundtree—responded to a reported burglary at 541 Capitol Boulevard in Elkhart, Indiana. [DE 52-3 at 1.] At no time did any of the officers have their body cameras on, as required by police policy. [DE 58.] Lanzen testified without contradiction that he was not issued a body camera because, per department policy, he is exempt from wearing them as a supervisor; and Dolshenko averred that his body camera's battery had run out that night due to overuse from earlier in the evening.  [DE 52-3 at ¶ 51; DE 52-4 at ¶ 60].

Soon after they arrived on the scene of the burglary, the officers heard five to six gunshots. [DE 52-13 at 2.] The scene of the burglary call (541 Capitol) and the location where the shots were heard being fired (1807 DeCamp) are right around the corner from one another. [DE 52-3 at 9.] Those gunshots came after a verbal altercation

3

between a party attendee, Shawn Scott, and an unknown black male, leaving Scott and his friend Delanos Johnson injured. [DE 52-13 at 3.] Scott was struck in the leg, and he hobbled to find assistance at a nearby hospital. *Id.* Johnson was shot in his back and leg and was seen lying in the driveway in front of 1807 DeCamp when the officers arrived. [DE 52-3 at ¶ 17; 58 at ¶ 47.]

As Officer Lanzen turned onto DeCamp Avenue, he saw a car speeding away and radioed it in. [DE 52-3 at ¶¶ 14-15.] The photo depicted below is from the relevant area. The house with the dark roof in the center of the photograph is 1807 DeCamp, the scene of the party and shooting. [DE 52-3 at 10.]



As they approached the scene, Officers Lanzen and Dolshenko observed numerous people outside of the 1807 DeCamp Avenue address, as if leaving a party,

scattering after hearing the gunshots. [DE 52-3 at ¶ 16.] Officer Lanzen noticed Johnson lying in the driveway. *Id.* at ¶ 17. As can be seen on the above photograph, as you face the house, on the left next to the driveway is an adjacent gravel alleyway that exits onto DeCamp Avenue. According to Officer Lanzen, he was on the sidewalk near the center of where the alley intersects DeCamp Avenue, when he heard tires kicking up gravel. *Id.* at ¶ 19. When he looked over from the wounded man, Officer Lanzen saw a vehicle less than 50 feet away traveling towards him and Officer Dolshenko (who was behind him in the street on DeCamp Avenue), and towards bystanders. *Id.* at ¶¶ 20-29. Officer Lanzen stated he tried to move out of the way, but the vehicle continued towards him, onto the grass next to the alley. *Id.* at ¶ 21; [DE 52-12 at 31.] He believed the driver was intentionally trying to hit him while fleeing the scene, and he feared for the safety of his fellow officers and the bystanders. [DE 52-3 at ¶ 22.] The path of the car, and how it veered in the driveway, is clearly visible in the picture of the gravel driveway. [52-3 at 10; 58-11 at 3.] Officer Lanzen estimated the car was traveling at 30 miles per hour down the driveway. [52-3 at ¶ 27.] As the vehicle came within a foot of him, fearing for his own safety, and the safety of others, Officer Lanzen fired three rounds into the front driver's side window. [DE 52-3 at ¶¶ 29-33.]

The driver, Norman Gary, was attempting to leave the party by turning left onto the alley from behind the house with his friend Jazzlyn Crase in her maroon Buick. [DE 52-2 at 6.] Seconds after he pulled out from behind the house and onto the alley, one of Officer Lanzen's bullets hit Gary's spine. [DE 52-2 at 7; 52-8; 52-11.] Before the car exited

5

the alley, Gary then slumped over onto Ms. Crase in the passenger seat, and she attempted to maneuver the vehicle to safety. [DE 52-2 at 7-8.]

At the same time, Officer Dolshenko also heard the vehicle coming towards them, saw the vehicle swerve towards Officer Lanzen, heard Officer Lanzen's shots and tried to get out of the way. [DE 52-4 at ¶¶ 21-32.] Officer Dolshenko feared the driver would strike him; he was also concerned about the safety of Officer Roundtree (whom he believed was behind him) or any number of bystanders in the area. *Id.* at ¶ 33. The vehicle passed about five to ten feet from Officer Lanzen and he fired five rounds at the driver. *Id.* at ¶ 34. The bullet in Gary's left hand matched Dolshenko's gun. [DE 52-8; 52-11.] To give some perspective, Ms. Crase stated that the officers fired within seconds of the vehicle driving out from behind the house. [DE 52-2 at 7.]

The vehicle veered right onto DeCamp Avenue, crossed it, struck another car, and ran into a tree. *Id.* at 8. Officers Dolshenko and Roundtree approached the car after hitting the tree. [DE 52-4 at ¶¶ 38-55.] Officer Dolshenko pulled Gary from the vehicle and testified that a black and silver handgun fell from where the driver was sitting. *Id.* at ¶¶ 50-56. He testified that the gun slide was locked in the rear, indicating it had fired until the magazine was empty; this was corroborated by the fact that ten of the casings recovered from the alley at the rear of the house matched the black and silver handgun that fell out of Gary's vehicle. *Id.* at ¶ 55; [DE 52-13.] Other shell casings matched an unrecovered 9mm firearm. [DE 52-13.]

It is disputed who shot Johnson, the man who was found lying in the driveway. For his part, Johnson did not believe he saw Gary that night or that Gary was the

6

unknown black male shooter. [DE 58 at ¶ 49.] Gary's friend and passenger in the car, Ms. Crase, also stated that she did not see Gary with a gun or see him fire any gun from her vehicle. [DE 58 at ¶¶ 15-16.] However, Gary's other friend Adam Brew testified to giving Gary his handgun earlier that night. [DE 61-3 at 6.] And, as stated, the gun that fell out when Gary was pulled from the car was empty and ten shell casings were found behind the house that matched the gun. [52-4; 52-13.] And the Plaintiff admitted (albeit by default) that Gary did in fact fire his gun 10 times that night before attempting to drive away that night. [DE 52-24 at 2.][2]

## Motion to Strike

Before I begin, I will address Defendants' Motion to Strike certain exhibits and corresponding arguments, which Plaintiff relies on in her Response. [DE 62.] Defendants seek to strike Plaintiff's exhibits at [DE 60-7, 60-8, 60-9, and 60-10.] Plaintiff's exhibit [DE 60-7] is an aerial diagram marked and signed by witness Victoria Pendleton. Plaintiff's exhibits [DE 60-8, 60-9, and 60-10] are anatomical diagrams that purportedly show the trajectory and location of the bullets that hit Gary. Defendants also argue that Plaintiff relies on this evidence throughout her brief. Unfortunately, Plaintiff failed to file any response to the Motion to Strike, which is a sufficient reason to grant it. *Goodpaster v. City of Indianapolis*, 736 F.3d 1060, 1075 (7th Cir. 2013) (failing to provide the court with any basis to decide claims and failure to respond to the opposing parties' arguments results in waiver of those claims); *see Wojtas v. Capital Guardian Tr. Co.*, 477 F.3d 924, 926 (7th Cir. 2007) (failing to oppose an argument constitutes waiver).

---

[2] The default admissions, and how they came about, are discussed in more detail *infra* at 10.

7

Even so, motions to strike are heavily disfavored and usually are only granted when the contested evidence prejudices the moving party and in order to "remove unnecessary clutter from the case." *Heller Fin., Inc. v. Midwhey Powder Co.,* 883 F.2d 1286, 1294 (7th Cir. 1989); *Wajvoda v. Menard, Inc.*, 2:11-CV-393-RL, 2015 U.S. Dist. LEXIS 132402, at *8 (N.D. Ind. 2015). Therefore, I will carefully review the evidence and determine whether it would be admissible at trial.

Hearsay is an out of court statement used to prove the truth of the matter asserted. FED. R. EVID. 801(c). If the out of court statement is used for another, legitimate purpose, such as proving how a statement effected the listener, then the statement is an exception to the hearsay rule. FED. R. EVID. 803. Before evidence can be admitted, it must be properly authenticated. FED. R. EVID. 901. Evidence may be properly authenticated by the testimony of a witness with knowledge of what the evidence is claiming to show. FED. R. EVID. 901(b)(1). The Supreme Court has rejected the notion that a nonmoving party must produce admissible evidence to avoid summary judgment. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). A nonmoving party is not precluded from relying on unauthenticated documents, so long as they are ultimately reducible to admissible evidence at trial. *Id.*

Indeed, Plaintiff may certainly rely on witnesses to authenticate the evidence [DE 60-7, 60-8, 60-9, and 60-10] through examination of Victoria Pendleton, whose signature and markings are found on the aerial photo of the scene [DE 60-7], or the coroner who performed the autopsy on Gary to identify whether the trajectory of the bullets is

depicted properly on the anatomical diagrams. [DE 60-8, 60-9, and 60-10.] Therefore, the Motion to Strike is DENIED.

## Discussion

Summary judgment must be granted when "there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). All facts and reasonable inferences drawn from those facts are construed in favor of the non-moving party. *Hackett v. City of South Bend*, 956 F.3d 504, 507 (7th Cir. 2020) (internal citation and quotations omitted). The non-moving party may not rely merely on allegations or denials in its own pleading, but rather must "present the court with the evidence she contends will prove her case." *Goodman v. NSA, Inc.*, 621 F.3d 651, 654 (7th Cir. 2010). The non-moving party may present evidence in the form of affidavits, depositions, answers to interrogatories, and admissions to show a genuine issue for trial. *Celotex*, 477 U.S. at 324. "[I]nferences relying on mere speculation or conjecture will not suffice." *Trade Fin. Partners, LLC v. AAR Corp.*, 573 F.3d 401, 407 (7th Cir. 2009).

**Fourth Amendment Claims and Qualified Immunity**

Excessive force claims are governed by the Fourth Amendment's "objective reasonableness standard." *Graham v. Connor*, 490 U.S. 386, 395 (1989); *Saucier v. Katz*, 533 U.S. 194, 201-02 (2001). "A police officer's use of force is unconstitutional if, judging from the totality of the circumstances at the time of the arrest, the officer used greater force than was reasonably necessary to make the arrest." *Payne v. Pauley*, 337 F.3d 767, 778 (7th Cir. 2003) (internal citation and quotations omitted). In analyzing this standard, a court must carefully balance "the nature and quality of the intrusion of the

individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Graham*, 490 U.S. at 396 (internal quotations and citation omitted). This inquiry is both fact intensive and highly sensitive to the circumstances of each case. *Id.* It is important to consider multiple factors, including: the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether the suspect is actively resisting or fleeing. *Id.*; *see Tennessee v. Garner*, 471 U.S. 1, 8-9 (1985). Oftentimes, officers are forced to make split-second decisions regarding the amount of force necessary in any given situation. *Graham*, 490 U.S. at 396-97. So, this is not an exercise in Monday-morning quarterbacking – I must consider the circumstances "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id.* at 396.

Unfortunately for Plaintiff, the facts here support that the officers acted reasonably. Before I discuss the actions of the officers, I must address yet another unfavorable development in this case for Plaintiff. The Defendants served on Plaintiff's counsel a series of Requests for Admission under Federal Rule of Civil Procedure 36(a)(3). [DE 52-24.] However, Plaintiff's counsel ignored them. *Id.*[3] Worse yet, despite the Defendants' repeated reliance on the Requests for Admission in their brief, Plaintiff makes no reference to them in her 95-page response brief. [DE 58.] The facts contained in those admissions are now deemed admitted. FED. R. CIV. P. 36(a)(3). This is because "[a]dmissions under Rule 36, even default admissions, can serve as the factual predicate for summary judgment. Rule 36(b) provides that a matter admitted is conclusively

---

[3] The citation to the Requests for Admission is to the Defendants' motion. This is because Requests for Admission are not filed on the docket per local rule. *See* N.D. Ind.L.R. 26(a)(1)(E).

established." *United States v. Kasuboski*, 834 F.2d 1345, 1350 (7th Cir. 1987) (internal quotations and citations omitted); *see also Walsh v. McCain Foods Ltd.*, 81 F.3d 722, 726 (7th Cir. 1996) (same); FED. R. CIV. P. 36(b).  So, in this case, Plaintiff admitted that Gary fired a gun ten times while leaving from the 1807 DeCamp address on the night in question. [DE 52-24 at 1-2.] What's more, this admission is corroborated by the fact that the gun was seen falling out of his car when the police opened the door, and the gun was empty. The forensic examiner's testimony also corroborated this fact through the recovery of spent casings from that gun being found behind the home. [DE 52-13 at 4; 52-14.]

As the officers approached the scene, they had probable cause to believe that Gary was the one responsible for the gunfire (given the way he was leaving the scene) and that he had driven his vehicle in a reckless way so as to endanger others. Recall that Gary was seen driving away from the scene in a way that the tires spun up gravel and left a tire mark. [DE 52-3 at 3; 52-12 at 32-33; 52-13 at 5.] Ms. Crase first stated in her deposition that Gary was only going a normal speed, and then when asked whether her testimony as to the tires not spinning was inaccurate, she responded affirmatively. [DE 2-2 at 6-7.] So, her testimony also does not contradict that the tires were spinning gravel as Gary drove into the alley. Additionally, photographs of the gravel alley support that conclusion that the car left the scene quickly and it veered as it traveled down the alley. [DE 58-11.]

Also recall the officers' uncontradicted testimony is that Gary aimed the car at them as he made his getaway, which is supported by the record. [DE 52-3 at 3-5; 52-4 at

11

3-4; 52-12; 52-13 at 5.] In her deposition, Ms. Crase stated that Gary pulled out from behind the house, took a left onto the alley, and then when Gary slumped into her lap, she swerved while trying to gain control of the car. [DE 52-2 at 7-8.] She states that the officers shot at the car seconds after she grabbed the wheel. *Id.* However, nothing in Ms. Crase's testimony contradicts the officers' testimony that Gary drove the car directly towards them. Plaintiff also emphatically states that Gary was not driving towards Officers Lanzen or Dolshenko, without providing any evidence to support this conclusion. [DE 58 at ¶¶ 86, 89, 94.] Rather, the evidence in the record places Gary as the driver in Ms. Crase's vehicle, which drove out from behind the house, and turned left onto the alley. [DE 52-2 at 7-8.] Furthermore, Officer Lanzen was in that alley on the sidewalk with Officer Dolshenko right behind him, and Ms. Crase's car came within a foot of Officer Lanzen and five to ten feet from Officer Dolshenko. [DE 52-2 at 7-8; 52-3 at 3-5; 52-4 at 3-4.]

It is clear from the record that Gary drove his friend's car in such a way as to endanger two police officers and bystanders leaving the party. It is reasonable to believe that a police officer—having heard gunshots and having seen a man lying in the front of the home after having been shot and then moments later seeing Gary drive out from behind the house where the shooting occurred—would ascertain that Gary could very well be a suspect in the shooting. Therefore, the severity of the crime, one of the factors I have to consider when determining the reasonableness of the officers' behavior strongly militates against Plaintiff.

In addition, Gary's driving reasonably put both Officers Lanzen and Dolshenko in immediate fear of their lives. Indeed, the evidence shows that Gary drove within one foot of Officer Lanzen as he drove away from the scene, and five to ten feet from Officer Dolshenko after almost hitting Officer Lanzen. As noted above, it is reasonable for an officer, upon seeing a vehicle appearing from behind the house after shots were fired and departing the alley onto the grass, would believe his or her safety and the bystanders' safety were at risk.

Additionally, a reasonable officer could easily assume that a vehicle leaving an area where gunshots were fired only moments before would believe that the driver was a suspect in the shooting and was attempting to flee the scene. Whether or not Gary was in fact the shooter, the circumstances of the situation would, at the very least, allow for a reasonable inference that Gary could be involved and that he was fleeing the scene. Therefore, the consideration of whether the suspect was actively fleeing does not weigh in Plaintiff's favor.

Under these circumstances, the officers had probable cause to believe that Gary posed a threat of serious physical harm to the officers and to others and it was not unreasonable for the officers to use deadly force in this situation. *Graham*, 490 U.S. at 396. Neither Plaintiff's Response nor Ms. Crase's deposition point to any contradiction in the record that would create a genuine issue of material fact. Therefore, because Officers Lanzen and Dolshenko acted reasonably in this situation, and Plaintiff has failed to provide evidence that creates a genuine dispute of material fact, Plaintiff's Fourth Amendment claims against them fails.

Additionally, Plaintiff asserted Fourth Amendment claims against Defendants Roundtree, Windbigler, and Thayer. [DE 1.] However, Plaintiff has failed to respond to Defendants' argument that they are entitled to summary judgment because these officers did not exert any force against Gary, let alone excessive force. [DE 52.] And arguments not presented in response to summary judgment motions are deemed waived. *Laborers' Int'l Union of N. Am. v. Caruso*, 197 F.3d 1195, 1197 (7th Cir. 1999); *see also Palmer v. Marion Cty.*, 327 F.3d 588, 597-98 (7th Cir. 2003). Therefore, because Plaintiff has waived her Fourth Amendment claims against Roundtree, Windbigler, and Thayer, the Plaintiff's Fourth Amendment claims fail against them as well.

The claims against the officers also fail because each of the Defendants is entitled to qualified immunity. Qualified immunity "shields officers from civil liability so long as their conduct 'does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *City of Tahlequah v. Bond*, 142 S. Ct. 9, 11 (2021) (*per curiam*) (citing *Pearson v. Callahan*, 555 U.S. 223, 231 (2009)). Whether Defendants are entitled to qualified immunity as a matter of law depends on whether (1) "[t]aken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right;" and (2) "whether the right was clearly established." *Saucier*, 533 U.S. at 201; *see Taylor v. City of Milford*, 10 F.4th 800, 806 (7th Cir. 2021). "A right is clearly established when it is 'sufficiently clear that every reasonable official would have understood that what he is doing violates that right.'" *Rivas-Villegas v. Cortesluna*, 142 S. Ct. 4, 7 (2021) (*per curiam*) (citing *Mullenix v. Luna*, 577 U.S. 7, 11 (2015) (*per curiam*)); *see Cibulka v. City of Madison*, 992 F.3d 633, 639-

14

41 (7th Cir. 2021) (finding that existing precedent must govern the specific facts at issue).

Courts may not "define clearly established law at too high a level of generality." *City of Tahlequah*, 142 S. Ct. at 11. "[S]pecificity is 'especially important in the Fourth Amendment context,' where it is 'sometimes difficult for an officer to determine how the relevant legal doctrine, here excessive force, will apply to the factual situation the officer confronts.'" *Id.* (citing *Mullenix*, 577 U.S. at 12). Qualified immunity is an affirmative defense and the burden shifts to the plaintiff to defeat it. *Alexander v. Milwaukee*, 474 F.3d 437, 443-44 (7th Cir. 2007). The plaintiff "must identify a case that put [the officer] on notice that his specific conduct was unlawful." *Rivas-Villegas*, 142 S. Ct. at 8. So, I consider whether Plaintiff alleged a violation of a constitutional right and whether that right was clearly established.

Having reviewed Plaintiff's entire 95-page Response and 26 exhibits, she does not cite to *any* legal authority, let alone identify a case that would meet her burden to defeat qualified immunity. [DE 58.] Even accepting all of Plaintiff's recitation of the facts as true, that Gary was not part of the shooting and did not intend to harm the officers or others, her argument is completely devoid of any reference to any legal authority that clearly establishes that Officers Lanzen's or Dolshenko's use of deadly force was unconstitutional. *City of Tahlequah v. Bond*, 142 S. Ct. at 11; *Rivas-Villegas*, 142 S. Ct. at 8; *Cibulka*, 992 F.3d at 639. Perhaps that is not surprising since the law is to the contrary. It has long been held that the police may use deadly force to stop a vehicle that presents a threat of death or serious bodily injury to the officers or others. *Plumhoff*

15

*v. Rickard*, 572 U.S. 765, 775-77 (2014); *see Scott v. Harris*, 550 U.S. 372, 384 (2007); *see also Scott v. Edinburg*, 346 F.3d 752, 759 (7th Cir. 2003) (deadly force deemed reasonable if the suspect's use of a car put the officers and those in the immediate vicinity in imminent danger).

In this case, the situation unfolded in a matter of seconds – Gary drove out from behind the house where shots were fired, he drove straight towards the officers without stopping, and drove within mere feet of both officers. The immediacy of this situation makes it highly unlikely that non-lethal force, such as giving verbal commands, would have been sufficient. There simply is no clearly established law from the Supreme Court or this Circuit that would have informed Officers Lanzen and Dolshenko that using deadly force against a vehicle heading right at them was unlawful. Without clearly existing precedent that squarely governs the specific facts in this case, Plaintiff fails to defeat the affirmative defense of qualified immunity.

### Municipal Liability – The *Monell* Claim

More than forty years ago, the Supreme Court held that municipalities can be liable for their unconstitutional policies. "[A] local government may not be sued under § 1983 for an injury inflicted solely by its employees or agents. Instead, it is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983." *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 694 (1978). And a failure to train officers can amount to a constitutional violation. *City of Canton, Ohio v. Harris*, 489 U.S. 378, 387

(1989). However, there can be no *Monell* liability where the plaintiff did not suffer a deprivation of his constitutional rights by an officer of the governmental entity involved. *City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986). As discussed above, I have found that none of the officers violated any of Gary's constitutional rights, and therefore, there can be no *Monell* liability.

What's more, for the City of Elkhart to be liable under a failure to train theory, the Plaintiff must allege deliberate indifference, that is, that the City of Elkhart had actual or constructive notice that its action or failure to act is substantially certain to result in a constitutional violation and it consciously or deliberately chose to disregard the harm. *City of Canton,* 489 U.S. at 388; *Flores v. City of S. Bend,* 997 F.3d 725, 731 (7th Cir. 2021). But the Plaintiff has presented no evidence on the alleged deficiencies in how Elkhart trains its officers. So, the failure to train theory is a nonstarter.

Finally, while the Plaintiff makes much of the fact that some of the officers were not wearing or not using their body cameras, despite a municipal policy requiring it, that is neither here nor there from a *Monell* point of view. This is because Section 1983 was enacted to redress violations of the U.S. Constitution, not departmental policies. *Estate of Biegart v. Molitor*, 968 F.3d 693, 698-99 (7th Cir. 2020) (citing *Scott*, 346 F.3d at 760). While I can certainly appreciate video footage as evidence, the fact that the officers did not have their body cameras on at the time of the incident is not an act that results in a *constitutional* harm to the Plaintiff. Therefore, Plaintiff's *Monell* claim fails for this reason as well.

**State Law Wrongful Death Claim**

The final claim is for wrongful death brought under state law. I have long thoughts about the viability of this claim. For starters, it appears plain that Plaintiff did not file a tort claim notice with the City within 180 days of the loss as is required by state law. [DE 52-24 at 3.] And the failure to file a tort claim notice can bar claims. *See* I.C. § 34-13-3-8. But the Seventh Circuit has repeatedly held that although the decision is discretionary, "[w]hen all federal claims in a suit in federal court are dismissed before trial, the presumption is that the court will relinquish federal jurisdiction over any supplemental state-law claims." *Al's Serv. Ctr. v. BP Prods. N. Am., Inc.*, 599 F.3d 720, 727 (7th Cir. 2010); *see also RWJ Management Company v. BP Prods. N. Am., Inc.,* 672 F.3d 476, 479 (7th Cir. 2012) (same). Because of the lack of any sufficient briefing from the Plaintiff on the issue, I am reluctant to dispose of the issue at this point. Therefore, I will decline to exercise supplemental jurisdiction over Plaintiff's state law claims. These claims will be dismissed without prejudice.

## Conclusion

For the reasons set forth above, Defendants' Motion to Strike is **DENIED**. [DE 62.]

Defendants' Motion to for Summary Judgment [DE 51] is **GRANTED** on all federal claims.

The court relinquishes jurisdiction on all state claims, those claims are **DISMISSED WITHOUT PREJUDICE** and may be filed with the state court. The Clerk

is DIRECTED to close this case.

SO ORDERED on February 18, 2022.

/s/ Philip P. Simon
PHILIP P. SIMON, JUDGE
UNITED STATES DISTRICT COURT